UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


| MICHELLE CRUZ, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Civil Action No. 12-30159-KPN |
| | ) |
| CITY OF HOLYOKE, HOLYOKE | ) |
| POLICE DEPARTMENT, | ) |
| LIEUTENANT DAVID PRATT, | ) |
| DETECTIVE PAUL BARKYOUMB, | ) |
| DETECTIVE BRIAN DUKE, and | ) |
| DETECTIVE ANTHONY BRACH, | ) |
| | ) |
| Defendants | ) |


MEMORANDUM AND ORDER WITH REGARD TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Document No. 63)
November 21, 2014

NEIMAN, U.S.M.J.

This civil action arises out of events in 2009 when Paul Barkyoumb

("Barkyoumb"), a former detective of the Holyoke Police Department, is alleged to have

repeatedly harassed Michelle Cruz ("Plaintiff").  Plaintiff now asserts various civil rights

claims pursuant to 42 U.S.C. § 1983 and state tort claims pursuant to M.G.L. c. 258, § 2

and Massachusetts common law against the City of Holyoke ("the City") and certain

Holyoke police officers, specifically, Barkyoumb, Lieutenant David Pratt ("Pratt"),

Detective Brian Duke ("Duke"), and Detective Anthony Brach ("Brach").[1]  In her nine-

count complaint, Plaintiff alleges that the City maintained a policy, custom, or practice in

_____

[1] Plaintiff has since acknowledged that the Holyoke Police Department, which had also
been named as a defendant, was an unnecessary party.  The court, therefore, will
dismiss the Department from this matter.

violation of her constitutional right to be free from harassment, stalking, and emotional abuse (Count I); that Barkyoumb, Pratt, Duke and Brach engaged in conduct in violation of this constitutional right (Count II); that Barkyoumb, Pratt, Duke and Brach conspired to commit perjury (Count III); that Pratt, Duke and Brach, in failing to intervene and prevent the harassment, ratified Barkyoumb's unlawful conduct (Count IV); and that Pratt, as Barkyoumb's supervisor, failed to intervene and prevent the harassment (Count V). Plaintiff further asserts claims of negligence and negligent hiring, training, and supervision against the City (Counts VI and VII) and both intentional and negligent infliction of emotional distress claims against Barkyoumb, Pratt, Duke, and Brach (Counts VIII and IX). The parties have consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.

Presently before the court is a motion for summary judgment filed by the City, Pratt, Duke, and Brach (together, "Defendants") pursuant to Fed. R. Civ. P. 56. For the reasons that follow, the court will grant the motion but in part only, leaving for trial Counts II and V as they concern Pratt. Barkyoumb himself has not similarly sought summary judgment. Accordingly, the claims against him, as set forth in Counts II, VIII and IX, shall also go forward to trial; the court, however, will *sua sponte* dismiss Count III as it applies to him.

## I. STANDARD OF REVIEW

When ruling on a motion for summary judgment, the court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the non-moving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank*, 27 F.3d 746, 748 (1st Cir. 1994). The non-moving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir. 1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

## II. BACKGROUND

The record reveals the following undisputed facts which are construed in a light most favorable to Plaintiff, the non-moving party. In doing so, the court deems admitted certain uncontroverted facts of record supplied by Defendants. *See* Local Rule 56.1.

Much of the court's analysis of the instant motion necessarily plays out within the larger context surrounding Plaintiff and Barkyoumb's relationship, particularly events during the spring and summer of 2009. The record, as constituted, reveals that Barkyoumb was repeatedly contacting Plaintiff via text messages, telephone calls and letters despite her requests that he not do so. For the moment, however, the court will concentrate on those facts which are relevant to the particular dispute between Plaintiff and Defendants Pratt, Duke, Brach and the City, not facts which might have been challenged by Barkyoumb had he pursued summary judgment as well.

In April of 2007, Plaintiff and Barkyoumb began a romantic relationship while he was employed as a Holyoke police officer. (Plaintiff's Statement of Material Facts ("Pl's SOF") ¶¶ 1-2.) About eight months later, in November, they jointly purchased a home in Southampton. (Id. ¶ 3.) Once they moved in together, however, their relationship

"began to take a troubling turn" and Barkyoumb became more controlling and jealous. (Id. ¶¶ 4-5.)  When Plaintiff began a new job in Connecticut, Barkyoumb's jealousy increased and he became paranoid; for example, he would become upset if he called or sent text messages and she did not respond while she was at work.  (Id. ¶¶ 6-8.)  As a result, in January of 2009, Plaintiff began sleeping in her daughter's room and locking the door at night.[2]  (Id. ¶ 9.)  By March, Plaintiff resided at the house only "part-time," otherwise living at her parents' home.  (Id. ¶ 12.)  For his part, Barkyoumb would stay at the house when Plaintiff was at her parents' home.  (Id. ¶ 13.)  Plaintiff and Barkyoumb soon decided to end their relationship.  (Id.)

Around the middle of April of 2009, Barkyoumb began sending Plaintiff unwanted text messages.  (Id. ¶ 14.)  Through her own text messages or telephone calls, Plaintiff told Barkyoumb to stop contacting her, but Barkyoumb continued to send text messages from his cellular work phone.  (Id. ¶¶ 15-16.)  When Barkyoumb persisted, Plaintiff purchased a program to block his calls from her personal cellular phone.  (Id. ¶ 18.)  After he began sending her text messages to her cellular work phone instead, she arranged with her employer, the State of Connecticut, to have his numbers blocked from that phone as well.  (Id. ¶¶ 19-20.)  Around April 29 or 30th, 2009, Plaintiff moved out of the house and she and Barkyoumb decided to sell the property.  (Id. ¶¶ 21-22; Defendants' Statement of Material Facts ("Defs' SOF") ¶ 2.)

At the same time and as a result of the unwanted text messages - - in particular,

---

[2] Plaintiff also asserts that in December of 2008, she got into an argument with Barkyoumb "in which he threatened to kill her," and she reported this to members of the State Police Department."  (Id. ¶ 98.)  Plaintiff's claims here, however, center on the conduct of Defendants, none of whom are connected with the State Police.

a text from Barkyoumb stating that he had driven by her parents' home - - Plaintiff contacted Sergeant Daniel Reardon ("Reardon") of the Holyoke Police Department, a superior to Barkyoumb, on his cell phone while he was at home.[3] (Pl's SOF ¶ 25; Defs' SOF ¶ 25.) She told Reardon that she did not want to be bothered by Barkyoumb and wanted him to stop sending her text messages; she specifically asked Reardon if he could "reel [Barkyoumb] in" and said she was afraid. (Pl's SOF ¶¶ 26-27.) Reardon asked if Barkyoumb had hit or threatened her, to which Plaintiff replied no, she just wanted Barkyoumb to leave her alone. (Defs' SOF ¶ 25; Pl's Exhibit 4, Deposition of Daniel Reardon ("Ex. 4").) Later, Reardon again asked if she had been harmed, and she replied no. (Ex. 4.) Plaintiff requested that someone speak with Barkyoumb and encourage him to stop bothering her and sending her text messages. (Pl's SOF ¶ 25.)

Reardon then spoke with Barkyoumb, encouraging him to leave Plaintiff alone and advising him instead to write her a letter rather than continuing to contact her via text messages or telephone. (Defs' SOF ¶ 26.) Although not what Reardon intended, Barkyoumb immediately wrote a four-page letter to Plaintiff which he left in the screen door where she was living. (Id. ¶¶ 26-27.)

Reardon also spoke with Pratt, a lieutenant with the Holyoke Police and Barkyoumb's supervisor. (Id. ¶ 29.) Reardon described his conversation with Plaintiff and informed Pratt that she had asked him to speak with Barkyoumb. Pratt asked Reardon if there were any reports or threats of violence, and Reardon reported none. (Id. ¶ 30; Ex. 4.) Reardon did not inform anyone further up on the chain of command of

---

[3] In some contrast, Defendants allege in their Statement of Facts that Plaintiff called Reardon in June 2009.

his conversation with Plaintiff.  (Ex. 4.)  Reardon has not been named as a defendant in this matter.

Anyway, Barkyoumb began contacting Plaintiff even more than before and voiced his anger that she had contacted his superiors.  (Pl's SOF ¶ 27.)  And in May of 2009, during a law enforcement training program on Cape Cod, Barkyoumb sent Plaintiff text messages accusing her of dating another Holyoke police officer.  (Pl's SOF ¶ 29.) That same month, Plaintiff made a "formal complaint" to an officer of the South Hadley Police Department regarding Barkyoumb's behavior.  (Pl's SOF ¶ 32.)  At the time, Plaintiff was residing in South Hadley.  (Id.)  Then on June 17, 2009, she received another letter from Barkyoumb.  (Id. ¶ 35.)  That same day Plaintiff reported the letter and a phone call from Barkyoumb to the South Hadley police.  (Id. ¶ 36.)  No South Hadley officer is a defendant here.

On July 1, 2009, Plaintiff called Pratt on his home telephone to let him know that Barkyoumb was "continuing to harass and stalk her."  (Id. ¶ 41; Defs' SOF ¶ 11.)  Pratt and Plaintiff, it should be noted, socialized together when she was dating Barkyoumb; Pratt considered her a friend at the time.  (Defs' Exhibit 10, Deposition of David Pratt.)  Plaintiff also informed Pratt that Barkyoumb was attempting to contact her through her son and was having his daughter call her directly.  (Defs' SOF ¶ 12.)  Pratt "indicated that he was aware of the problems she was having with Mr. Barkyoumb and that he had talked to him, but that he thought he had stopped contacting her."  (Pl's SOF ¶ 42.)  Still, Pratt told Plaintiff that he would follow up with Barkyoumb and get back to her.  (Defs' SOF ¶ 13.)  When Pratt thereafter spoke with Barkyoumb, he denied any violence or threats of violence.  (Defs' SOF ¶ 15.)  Afterwards, Pratt called Plaintiff, told

her about his conversation with Barkyoumb, and asked her if there was anything else he could do to help her; Plaintiff responded "No" and "Thank you for your help." (Defs' SOF ¶¶ 16-17.)

On July 1, 2009, Plaintiff also filed a request for a restraining order against Barkyoumb in the Eastern Hampshire County district court. (Pl's SOF ¶ 44.) A temporary order was issued *ex parte*, effective until July 9, 2009. (Id. ¶ 45.) Upon notice of the complaint and pursuant to police protocol, Barkyoumb turned in his firearm and was removed from street duty. (Defs' SOF ¶ 21.) On July 9, 2009, the court held a hearing on the matter. (Pl's SOF ¶ 44; Defs' SOF ¶ 22.) Pratt testified on behalf of Barkyoumb, and Brach attended the proceeding. (Pl's SOF ¶ 46; Defs' SOF ¶ 22.) The court denied the application for an extended restraining order, after which Plaintiff "stated to the court that although there were never any arrests or acts of violence between [her and Barkyoumb,] she was concerned for the safety of her and her children." (Pl's SOF ¶ 47.) Pratt thereafter returned Barkyoumb to regular duty. (Defs' SOF ¶ 22.)

Plaintiff did not receive any further unwanted messages or calls from Barkyoumb at least through September 8, 2009, during which time the blocks on Plaintiff's cellular phones remained operative. Then, on September 9th, Plaintiff received a series of text messages on her personal cell phone from an unknown telephone number. (Pl's SOF ¶ 48.) The text messages, which Plaintiff found alarming, were as follows:

> 12:01 p.m.: "I will get you back for it."
>
> 2:40 p.m.: "Guess. I won't tell Psycho."
>
> 2:52 p.m.: "Y R U afraid"and "R U afraid? Prove that. Psycho, dike, bitch."

3:00 p.m.: "prove it psycho"

4:19 p.m.: "R U afraid? Prove that. Psycho, dike, bitch."

(Id. ¶ 49.)

Plaintiff immediately went to the Connecticut State Police but "there was an event in the city and they were busy," so she went to the Massachusetts State Police attached to the Hampden County District Attorney's office and filed a harassment complaint. (Id. ¶ 50.) While there, officers called the phone number that was sending the text messages. (Id.) Plaintiff then received the following text message at 5:38 p.m.: "Nice try. Like I would answer, psycho." (Id. ¶ 51.) And then at 5:55 p.m.: "Like U left me alone. Psycho cunt. I will find a way to get you back." (Id. ¶ 49.)

Starting around 3:00 p.m. the next day, September 10th, Plaintiff began to receive multiple text messages, similar in their harassing and threatening tone, from the same telephone number. (Id. ¶ 52.) She believed Barkyoumb was sending the messages and reported that to the Connecticut State Police. (Id. ¶¶ 52-53.) That day or the next, Plaintiff received an *ex parte* restraining order against Barkyoumb, effective until September 21, 2009, when a further hearing would be held. (Id. ¶ 54.) Because of the Connecticut court filing, Barkyoumb was again removed from street duty and turned in his firearm. (Defs' SOF ¶ 47.)

For purposes of their instant motion, Defendants assume that Barkyoumb authored these text messages. The following facts from the record allege but do not prove how Barkyoumb may have come to obtain the cellular phone used to send these messages.

On September 4, 2009, Holyoke Police officers executed a search warrant at 527

South Bridge Street. (Defs' Sub-exhibit 6-C, Application for Criminal Complaint against Paul Barkyoumb.) Barkyoumb had been investigating the distribution of controlled substances at that location and was the lead investigator. (Id.) Upon execution of the warrant, a woman named Elizabeth Perez and three other individuals were arrested. (Id.) Pratt was the supervising officer for and was present during the raid. (Defs' SOF ¶ 57; Ex. 10.) Brach, but not Duke, was also present at the raid and served as the evidence officer. (Defs' SOF ¶¶ 55-56.)

Four days later, an attorney for Romero Vidal filed a motion with the district court in Holyoke for the return of property, including his driver's license, taxi license, wallet, watch, and cellular phone. (Defs' SOF ¶ 57; Defs' Sub-exhibit 6-A, Motion to the Court dated September 8, 2009 ("Ex. 6-A").) Vidal had been one of those arrested during the raid. That same day, Assistant District Attorney Joan Dietz called Pratt with regard to the motion. (Defs' SOF ¶ 57; Ex. 6-A.) Dietz's notes indicate that Pratt stated that the police did not take the items and that they must have been left in the apartment. (Ex. 6-A.)

At some point after the raid, although it is unclear from the record when, Brach saw multiple cell phones in a bag on Barkyoumb's desk. (Pl's Exhibit 6, Deposition of Anthony Brach.) Brach did not examine or look at the phones, nor does he remember seeing any of them before. (Id.) Sergeant Reardon also observed the clear plastic bag with about eight to ten cellular phones inside. (Ex. 4.) Barkyoumb told Reardon that he wanted to get rid of the phones because he was afraid that another detective in his unit would say that he had phones in his desk. (Id.) At the time, Reardon did not suspect that the cell phones were part of the seizure in the Holyoke raid or that Barkyoumb was

trying to destroy evidence.  (Id.)

In any event, the hearing on the extended restraining order began in Connecticut Superior Court on September 21, 2009, and continued on September 24th and October 1st.  (Pl's SOF ¶ 58.)  Pratt, Duke, and Brach all testified on behalf of Barkyoumb.  (Id.) While being cross-examined on the 24th by Plaintiff's lawyer, Pratt learned of a woman named Elizabeth Perez who alleged that her cellular phone was stolen during the September 4, 2009 police raid in Holyoke.  (Defs' SOF ¶ 50.)  Plaintiff disputes this fact and alleges that Pratt knew earlier than September 24, 2009, that Perez's phone had been stolen from the raid.  It turns out that Perez's phone was the same one used to send the threatening September text messages to Plaintiff.  (Pl's SOF ¶ 56.)  On October 1, 2009, the court issued a six-month restraining order against Barkyoumb.  (Id. ¶ 77.)

Just prior thereto, on September 25, 2009, the Holyoke Police Department, based on Elizabeth Perez's allegations regarding the theft of her cell phone and Plaintiff's allegations of the texts she received on September 9 and 10, opened an internal affairs investigation of Barkoyumb.  (Pl's SOF ¶ 78; Def's SOF ¶ 59.)  As a result of that investigation, the Holyoke police filed an application for a criminal complaint against him for larceny under $250, criminal harassment, and perjury.  (Id. ¶ 79.)  One year later, on September 10, 2010, Barkyoumb pled guilty to criminal harassment for his conduct from April through July 2009, the complaint having been amended to remove any allegations involving the September 2009 text messages.  (Id. ¶ 80.)  The larceny charge was continued without a finding, and the perjury charge was not prosecuted.  (Id.)  Barkyoumb resigned from the Holyoke Police Department on

September 13, 2010.  (Id. ¶ 81.)

## III. DISCUSSION

As will become evident, the court has had to analyze the above-described facts from different perspectives depending on the claim asserted by Plaintiff.  Each count has its own players, each player's status varies depending on the count, and each count has its own standard and exceptions, some seemingly at odds with one another.  Thus, proof which might be deemed adequate in one context, thereby enabling a count to survive summary judgment, may be found dispositive in another, not because the facts are different but because the measuring devices vary.  The court trusts that this all will become clearer as its analysis unfolds.

A.  Claims Pursuant to 42 U.S.C. § 1983

At oral argument on Defendants' motion, the court asked Plaintiff's counsel whether her section 1983 claims were targeting Pratt, Duke and Brach in their individual capacities, their official capacities, or both.  Although counsel indicated that Plaintiff was asserting her claims against these defendants in *both* their official and individual capacities, that is belied in large part by Plaintiff's complaint; its caption identifies these defendants in their official titles only and the complaint itself asserts that they were "at all times material to this case [] duly appointed police officer[s] of the Holyoke Police Department in the City of Holyoke."  Likewise, Plaintiff's memorandum in opposition to the motion for summary judgment specifically notes that Pratt, Duke and Brach had been acting in their official capacities.

Even so, as explained in *Stratton v. City of Boston*, 731 F. Supp. 42, 45 (D. Mass. 1989), an "allegation stating that a claim is made against a defendant identified

11

both by name and by official title . . . is ambiguous [because] [i]t does not specify whether a claim is being alleged against the defendant individually, or instead against the defendant in his official capacity, or both." In *Stratton*, the complaint identified one of the defendants in the caption as "Francis Roache, Commissioner." Here, too, Plaintiff identified the official titles of the three defendants in the caption of the complaint, *e.g.*, "Lieutenant David Pratt," not in their individual capacities. This distinction is important "because the applicable law and the collection of damages vary depending on how the official is sued." *Id*.

The First Circuit has not yet resolved the required specificity of pleadings in this regard. Accordingly, the court has chosen to follow the approach taken in *Biggs v. Meadows*, 66 F.3d 56, 59 (4th Cir. 1995), and has looked to "the substance of [each of] the plaintiff's claim[s], the relief sought, and the course of proceedings" to determine the appropriate capacity in which Pratt, Duke and Brach have been sued. Based on that review and for reasons addressed below, the court will treat Counts III and IV as asserting only official capacity claims and Counts II and V as asserting only individual capacity claims.

Count I: Section 1983 claim against the City

Among other things, Plaintiff alleges in Count I that the City violated her constitutional rights because it maintained a policy, custom, practice, or pattern of failing to adequately and properly investigate complaints of criminal harassment and stalking. Plaintiff conceded at oral argument, however, that the record does not support the part of her claim which asserts that the City failed to properly and adequately train and supervise its police officers. Count I, it should be noted, necessarily incorporates any

parallel claims against the individual defendants in their official capacities; official capacity claims are actually claims against the municipality itself. *See McMillian v. Monroe County,* 520 U.S. 781, 785 n.2 (1997).

Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), municipalities are only liable for unconstitutional policies or practices. A municipality cannot be held liable for a purported constitutional civil rights violation under the general principles of vicarious liability or respondeat superior. *Monell*, 436 U.S. at 691. Thus, for Plaintiff's section 1983 claim to succeed against the City, she must show that a policy or custom was the cause of the alleged constitutional violation. *Manarite by and through Manarite v. City of Springfield*, 957 F.2d 953, 958 (1st Cir. 1992). To establish such a custom, "[P]laintiff must prove a practice so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Armstrong v. Lamy*, 938 F. Supp. 1018, 1035 (D. Mass. 1996) (internal quotation marks omitted).

In the motion for summary judgment, the City first argues that Plaintiff has failed to identify a violation of a clearly established constitutional right and, second, that she has failed to demonstrate a custom, habit, or practice of inadequately and improperly investigating complaints of criminal harassment and stalking. As might be expected, Plaintiff disagrees and, further, asserts that the City, through the individual defendants acting under color of state law, failed to protect her despite their obligation to do so under the Commonwealth's 2009 Domestic Violence Enforcement Guidelines ("Guidelines").

The Guidelines set out best practices with respect to "domestic violence calls." (Pl's Exhibit 12.) Relying on M.G.L. c. 209A, § 1, the Guidelines define the term "abuse"

as one or more of the following acts: "(1) Attempting to cause or causing physical harm; (2) Placing another in fear of imminent serious physical harm; and (3) Causing another to engage involuntarily in sexual relations by force, threat, or duress."  (Id.)  In turn, section 4.2 of the Guidelines provides, among other things, that law enforcement supervisors "will ensure that the provisions of M.G.L. c. 209A, other related statues, and these guidelines are adhered to," "shall make the safety and protection of victims and other family members a priority," and "make "[e]very effort . . . to provide law enforcement protection and other safety measures to a victim [of] domestic violence." (Id.)  Such measures, according to the Guidelines, "should be taken immediately following the report of an abusive incident."  (Id.)

The court will assume, without deciding, that there exists in some measure a constitutional right underlying Plaintiff's claim in Count I.  The court concludes, however, that, even so, Plaintiff has proffered insufficient evidence to suggest, let alone prove, the existence of any custom, pattern, or practice on the part of the City of inadequately and improperly investigating complaints of harassment and stalking.  Moreover, Plaintiff has failed to provide evidence of any instance of a failure to investigate, other than possibly her own.  *See Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989) ("[E]vidence of a single event alone cannot establish a municipal custom or policy.").  Granted, when a "'single incident' . . . involves the concerted action of a large contingent of individual municipal employees, the event itself [can] provide[] some proof of the existence of the underlying policy or custom."  *Id.* at 1157.  But, that is not the case here.

The record contains no evidence that Plaintiff ever contacted Duke or Brach regarding Barkyoumb's harassing behavior, and it cannot reasonably be inferred from

the facts that they failed to investigate.  And while Pratt's actions are somewhat different, a difference which will be addressed below, the record fails to show that he "acted in concert" with the other individual defendants either in failing to investigate or not complying with the Guidelines.  *See id.* at 1156.  In sum, the facts offered by Plaintiff hardly reflect the existence of a "longstanding, wide-spread" practice on the part of the City of failing to investigate complaints of harassment and stalking.  *See id.* Accordingly, summary judgment will enter in favor of the City on Count I.

Count II: Section 1983 claims against Pratt, Duke, and Brach

Based on Plaintiff's memorandum of law, the court understands Count II to be premised on the same violations alleged in Count I, namely, the failure to intervene and the failure to investigate.  Insofar as Count I necessarily incorporated Plaintiff's section 1983 claims against Pratt, Duke and Brach in their official capacities, the court construes Count II as lodged against them in their individual capacities only.

In seeking summary judgment, Pratt, Duke and Brach argue that their conduct was reasonable, in good faith, and not in violation of any clear, apparent, and particular constitutional right of Plaintiff.  Accordingly, they argue, they are protected by qualified immunity.  For the reasons which follow, the court finds this argument persuasive with respect to Duke and Brach, but, given the existing record, the court is not prepared at this time to cloak Pratt with the same immunity.

Qualified immunity "provides a safe harbor for public officials acting under the color of state law who would otherwise be liable under 42 U.S.C. § 1983 for infringing the constitutional rights of private parties."  *Whitfield v. Melendez-Rivera*, 431 F.3d 1, 6 (1st Cir. 2005).  The qualified immunity inquiry has two parts.  *See Maldonado v.*

*Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009) (clarifying qualified immunity test in the First Circuit). "A court must [often first] decide whether the plaintiff has made out a violation of a constitutional right." *Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013); *see Walden v. City of Providence*, 596 F.3d 38, 52 (1st Cir. 2010) (court has discretion as to which part of the inquiry to address first). If so, the court must then determine "whether the right was clearly established at the time of the violation." *Drumgold*, 707 F.3d at 42. This second inquiry, in turn, has two facets. *Id.* "The first focuses on the clarity of the law at the time of the violation." *Id.* The second "focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights." *Id.* *See also Suboh v. District Attorney's Office of the Suffolk Dist.*, 298 F.3d 81, 90 (1st Cir. 2002) (describing qualified immunity inquiry as a three-part test).

As an initial matter, the court concludes that Plaintiff has made out a violation of a constitutional right, at least against Pratt, Barkyoumb's superior. Although as a general matter, "the government's failure to protect an individual from third-party private violence (even in the face of a known danger) ordinarily does not constitute a due process violation," the First Circuit has "recognized that the Due Process Clause may be implicated where the government affirmatively acts to increase the threat to an individual of third-party private harm or prevents that individual from receiving assistance." *Coyne v. Cronin*, 386 F.3d 280, 287 (1st Cir. 2004) (citing *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)). This exception is commonly known as the state created danger doctrine. *See Rivera v. Rhode Island*, 402 F.3d 27, 35 (1st Cir. 2005).

16

Plaintiff's claim is rooted in this theory; she essentially contends that the three individual defendants' conduct "enhanced" the danger Barkyoumb posed to her and then "failed to protect against this risk," thereby implicating her due process rights. *See id.* at 34-35. To be sure, Plaintiff is not arguing that the individual defendants made *explicit* assurances to Barkyoumb that he could act with impunity. But Plaintiff does assert that Pratt, Duke and Brach's actions *implicitly* encouraged Barkyoumb's harassment. *See Okin v. Village of Cornwall-On-Hudson Police Dept.*, 577 F.3d 415, 427-428 (2d Cir. 2009).

In the court's view, the facts of record fail to make out a constitutional violation by Duke or Brach. As for Duke, those facts fail to support the inference that he was aware either of Barkyoumb's harassment or of Plaintiff's complaints of harassment. Moreover, there are no facts to suggest that Duke had any information compelling him to investigate Barkyoumb or to intervene into his and Plaintiff's relationship; the record merely reveals that Duke testified at the September 2009 hearing in Connecticut. And even if the court were to assume that Duke was aware of some alleged misconduct by Barkyoumb - - given that he was removed from duty in both July and September 2009 - - the record is devoid of evidence suggesting, let alone proving, that Duke explicitly or implicitly encouraged Barkyoumb's harassment.

Similarly, the record does not reflect any failure to act on the part of Brach, Plaintiff not having contacted him directly with regard to Barkyoumb. True, Brach did attend the July 2009 court hearing concerning Plaintiff's request for an extended restraining order, so it can be reasonably inferred that he heard her allegations regarding Barkyoumb's conduct; the court, however, did not extend the restraining order

at that time.  And although Brach (i) was present at the September raid, where he served as the Department's evidence officer, (ii) testified at the restraining order hearing in September, and (iii) on one occasion saw multiple phones on Barkyoumb's desk, these facts do not trigger the constitutional violation Plaintiff invokes here.

In contrast, Pratt did know that Plaintiff and Barkyoumb had a troublesome relationship and, more specifically, that she wanted Barkyoumb to stop harassing her. In fact, prior to Plaintiff contacting Pratt directly, she spoke with Reardon, telling him, among other things, that she was "afraid" of Barkyoumb.  Reardon, in turn, passed that information on to Pratt.  Pratt did ask Reardon whether there were any threats of violence but, when told there was none, elected to not take any action.  Unfortunately for Plaintiff, Barkyoumb contacted her even more than before, angry that she had contacted his colleagues.

Plaintiff then reached out directly to Pratt for assistance.  Although Plaintiff again denied any violence or threats of violence on Barkyoumb's part, she did tell Pratt that Barkyoumb was "continuing to harass and stalk her." (Pl's SOF ¶ 41; Defs' SOF ¶ 11.) But other than speaking with Barkyoumb and encouraging him to stop contacting Plaintiff, Pratt took no other action.  That same day or the next, Plaintiff on her own sought and obtained an *ex parte* restraining order against Barkyoumb.  About one week later, when Plaintiff sought an extension of the order, Pratt actually testified on behalf of Barkyoumb.  To be sure, the court denied the request for an extension.  Still, in light of what Pratt knew at the time, particularly allegations from a potential victim of harassment, the question arises whether his affirmative conduct - - not only speaking with Barkyoumb but neglecting to reprimand him for his continued behavior but

18

testifying for him as well  - - might well have emboldened Barkyoumb to continue his harassment.  In short, a reasonable factfinder could conclude that Pratt, by his conduct, "enhanced the danger" to Plaintiff because he conveyed to Barkyoumb that he could "continue to engage in [harassment] with impunity" and, thus, violated Plaintiff's due process rights.  *See Okin*, 577 F.3d 430-31.

In order to prevail on such a theory, however, Plaintiff must also show that Pratt's conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Coyne*, 386 F.3d at 287; *see Rivera v. Rhode Island*, 402 F.3d 27, 35 (1st Cir. 2005); *Hasenfus v. LaJeunesse*, 175 F.3d 68, 73 (1st Cir.1999).  Thus, "[n]ot every negligent, or even willfully reckless, state actions that renders a person more vulnerable to danger takes on the added character of a violation of the federal Constitution."  *Soto v. Flores*, 103 F.3d 1056, 1064 (1st Cir. 1997).  Still, "[t]he conscience-shocking standard is not a monolith; its rigorousness varies from context to context."  *Coyne*, 386 F.3d at 288.  For instance, "in situations where a substantive due process claim might lie and where actual deliberation on the part of a governmental defendant is practical, the defendant may be held to have engaged in conscience-shocking activity even without actual malice."  *Id.* (citing example where government official assumes custody of a person and then displays deliberate indifference to his ward's basic human needs); *Rivera*, 402 F.3d at 36 ("In situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'").

Keeping in mind the difference between conventional torts and constitutional violations, the court concludes that genuine issues of material fact preclude a finding

that Pratt's conduct was not sufficiently shocking to the contemporary conscience.  *See Okin*, 577 F.3d at 431-32.  This is not an easy call.  On the one hand, Pratt knew that Plaintiff had sought help from at least two police officers, himself included, expressed fear about Barkyoumb's behavior, and eventually sought a restraining order against him.  Thus, Pratt had "ample time for reflection and for deciding what course of action to take" in response to Plaintiff's complaints yet did little to effectively mitigate the harassment.  *Okin*, 577 F.3d at 432.  To the contrary, Pratt actually testified for Barkyoumb at two different hearings at which Plaintiff sought a restraining order.  On the other hand, Pratt inquired of Plaintiff whether there had been any violence and did speak to Barkyoumb.  Still, domestic violence is a known danger which police officers need to be prepared to fully address.  *See* 2009 Guidelines.  In the end, a reasonable factfinder could conclude that Pratt's affirmative actions demonstrated a willful disregard of the obvious risks of criminal harassment by a police officer colleague, which disregarded may well have enhanced the danger to Plaintiff.  *See Coyne*, 386 F.3d at 288 (discussing deliberate indifference); *Okin*, 577 F.3d at 432 (same).

    Nonetheless, Pratt would be entitled to qualified immunity if the constitutional right Plaintiff invokes was not "clearly established at the time of the violations." *Drumgola*, 707 F.3d at 42.  To make that determination, the court must consider "the clarity of the law at the time of the violation" and "the facts of the particular case," such that "a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights."  *Id.*; *Wilson v. City of Boston*, 421 F.3d 45, 56 (1st Cir. 2005).  "One tried and true way of determining whether this right was clearly established at the time the defendant acted, is to ask whether existing case law gave the

defendants fair warning that their conduct violated the plaintiff's constitutional rights."
*Suboh*, 298 F.3d at 93. Although such an inquiry "must be undertaken in light of the specific context of the case," government actors "can still be on notice that heir conduct violates established law even in novel factual circumstances." *Wilson*, 421 F.3d at 56. Thus, "'the salient question . . . is whether the state of the law in [2009] gave [Pratt] fair warning that [his] alleged treatment of [Plaintiff] was unconstitutional.'" *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); accord *Drumgold*, 707 F.3d at 42; *Maldonado*, 568 F.3d at 269; *Suboh*, 298 F.3d at 95. Finally, the court must look to "not only Supreme Court precedent, but all available case law," *Suboh*, 298 F.3d at 93, including federal cases outside its own circuit. *Hatch v. Dep't for Children, Youth & Their Families*, 274 F.3d 12, 23 (1st Cir. 2001).

In 1997, the First Circuit recognized that a substantive due process claim could exist where a "government employee, in the rare and exceptional case, affirmatively acts to increase the threat of harm to the claimant or affirmatively prevents the individual from receiving assistance." *Frances-Colon v. Ramirez*, 107 F.3d 62, 64 (1st Cir. 1997) (citing *Dwares v. City of New York*, 985 F.2d 94, 96 (2d Cir. 1993)). Seven years later*,* the First Circuit again recognized that "the Due Process Clause may be implicated where the government affirmatively acts to increase the threat to an individual of third-party private harm or prevents that individual from receiving assistance." *Coyne*, 386 F.3d at 287. Although the facts varied widely in these decisions, they certainly provided notice that a police officer can violate a person's due process rights by affirmatively creating or increasing the risk of private violence against that person.

Here, Pratt's behavior could be found by a reasonable jury to have

communicated to Barkyoumb that, should he continue to harass Plaintiff, nothing would be done to effectively stop him.  This type of behavior is comparable to that in *Dwares*, albeit the officers there expressly told the skinheads that their violence would not be stopped.  Such a distinction, however, does not undermine the key point that, viewing the evidence favorably to Plaintiff, Pratt was aware that Barkyoumb had intentionally harassed Plaintiff and that, as Barkyoumb's supervisor, he had the authority to stop, or attempt to stop, the continuation of such conduct.  *See Okin*, 577 F.3d at 434.  And while Plaintiff's claim is not the exact one described in *Coyne*, it does involve a government actor who could reasonably be found to have created a situation where a vulnerable individual would be harmed.

In short, the state of the law in 2009 provided Pratt fair notice that his conduct could violate Plaintiff's constitutional rights, namely, that police officers were prohibited from affirmatively acting in such a way, whether explicitly or implicitly, that contributed to the vulnerability of a known victim by fostering violence against that victim.   Here, a factfinder could reasonably conclude that in the course of his official duties, Pratt's actions  - - his failing to file any reports and begin a formal investigation or take other internal actions and testifying in favor of Barkyoumb - - would affirmatively communicate that Barkyoumb could continue to harass Plaintiff without fear of further police intervention, despite the existing Guidelines for handling domestic violence matters. *See Hope*, 536 U.S. at 738 ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious.").  If a jury were to make these findings here, Plaintiff would not be entitled to qualified immunity.  *See Drumgold*, 707 F.3d at 42.

In sum, for the reasons stated, both Duke and Brach, but not Pratt, are entitled to summary judgment with respect to Count II.

Count III: Section 1983 claim of conspiracy

In Count III, Plaintiff alleges that, in addition to Barkyoumb, Pratt, Brach and Duke, "all under color of state law, conspired and entered into express and/or implied agreements, understandings, or meetings of the minds to deprive her of her constitutional right by testifying falsely at the Connecticut hearing on her request for a restraining order."  The complaint, however, does not specifically allege which of Plaintiff's constitutional rights was violated by the these individuals nor has she provided further enlightenment in her brief opposing Defendants' motion for summary judgment. As best the court can tell, her theory appears to be that she was deprived of an alleged constitutional right to be free from harassment as a result of the conspiracy, which the court will, for purposes here, "assume, without deciding, . . . amount[s] to an actionable deprivation of federally protected rights."  *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980).

 In seeking summary judgment, Pratt, Duke and Brach argue, citing *Briscoe v. LaHue*, 460 U.S. 325 (1983), that they are entitled to absolute immunity on any section 1983 claims stemming from their testimony as police officer witnesses at the Connecticut hearing.  Even if they are not entitled to such immunity, they continue, Plaintiff proffers no facts which could establish any conspiracy between them or with Barkyoumb. The court need not address the first argument since the alternative argument of insufficient evidence wins the day.

Even when viewed in Plaintiff's favor, the record lacks sufficient evidence to

demonstrate an "agreement among conspirators" to commit perjury. *Thore v. Howe*, 466 F.3d 173, 179 (1st Cir. 2006). Simply put, there is no evidence of planning, premeditation, or non-testimonial acts between Pratt, Brach and Duke in furtherance of a conspiracy to testify falsely at the hearing. *See Mitchell* v. *City of Boston*, 130 F. Supp. 2d 201, 213 (D. Mass. 2001) ("Plaintiffs have no evidence that [Officer] DeMarco engaged in any non-testimonial acts in furtherance of the alleged conspiracy which independently give rise to a civil rights cause of action."). Indeed, Plaintiff herself acknowledged in her opposing brief that, "[a]lthough it is true that the Defendants were sequestered at the time of this hearing, there is no way to know what conversations occurred amongst the Defendants prior to this hearing." Granted, Plaintiff stresses that the three individual defendants "were all good friends and watched out for each other," but that is obviously insufficient to get Plaintiff past summary judgment on this count. In short, the court cannot reasonably infer any type of agreement or meeting of the minds to engage in a conspiracy or, indeed, to commit perjury.

In addition, the record does not support Plaintiff's contention that, prior to the hearing, Pratt, Brach and Duke knew Barkyoumb had stolen Elizabeth Perez's cellular phone and sent the threatening September text messages. At best, the record reveals that on September 8, 2009, Pratt learned that Romero Vidal sought the return of his property from the Holyoke Police Department and then on September 25, 2009, learned that Elizabeth Perez had alleged that Barkyoumb stole her cellular phone. As for Brach, the record shows only that at some point after September 4, 2009, he saw Barkyoumb with about eight to ten cell phones in a bag at his desk. Further, there are no facts relevant to Duke's alleged involvement other than his having testified at the Connecticut

hearing.

Accordingly, the court will enter summary judgment on Count III insofar as it concerns Pratt, Duke and Brach.  In addition, the court, *sua sponte*, will order summary judgment in Barkyoumb's favor on this count since the record provides no additional, relevant facts with regard to his involvement in this alleged conspiracy.

Count IV: Section 1983 claim of ratification

Count IV of the complaint alleges that Pratt, Duke and Brach "ratified the actions of . . . Barkyoumb by allowing him to continue to violate the Plaintiff's constitutional rights on numerous occasions" and that they "all stood by without intervening to prevent the misconduct complained [of] by the Plaintiff."  For the reasons which follow, the court will grant Defendants' motion with respect to this count.

A section 1983 claim of ratification serves as a basis for municipal liability.  As the Supreme Court explained, "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be *chargeable to the municipality* because their decision is final."  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (emphasis added).  Because the City is not a named defendant on this count, the court construes this claim as against the individual defendants in their official capacities so as to invoke the proper municipal defendant, the City.  *See McMillian*, 520 U.S. at 785 n.2 (official capacity claims are actually claims against the municipal entity itself).

In support of their motion, Pratt, Duke and Brach argue that Plaintiff has failed to proffer any material evidence which shows their (1) conscious condoning or encouraging of Barkyoumb's misconduct; (2) failure to reprimand or discipline Barkyoumb after they learned of his misconduct; or (3) conscious choice to ratify his

25

misconduct.  In response, Plaintiff argues that, by not investigating Barkyoumb's conduct, not intervening, and not disciplining him, these individuals chose to support or ratify his unconstitutional harassment of her.  Although for purposes of this discussion the court will assume Barkyoumb unlawfully violated Plaintiff's constitutional rights, Defendants' arguments are still more persuasive.

Similar to a *Monell* claim (the subject of Count I), a plaintiff asserting a ratification claim must prove the existence of an unconstitutional municipal policy.  See *City of St. Louis*, 485 U.S. at 128.  In cases where a single decision by a municipal policymaker may be sufficient to trigger section 1983 liability under *Monell*, a plaintiff must still show that the triggering decision was the product of a "conscious, affirmative choice" to ratify the conduct in question.  *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992).

As an initial matter, Plaintiff fails to address - - in her memorandum in opposition, her statement of material facts, or in the record at large - - whether Pratt, Duke and Brach are even municipal policymakers.  To the contrary, the record plainly reveals that these three individuals did not have "final policymaking authority over the propriety of [Barkyoumb's] conduct."  *Tubar v. Clift*, 2008 WL 5142932 (D. Wa. Dec. 5, 2008), at *5, n.2 (concluding that police chief is an official policymaker exposing city to liability under the ratification doctrine).  *See Lytle v. Carl*, 382 F.3d 978, 982-983 (9th Cir. 2004) (discussing how to identify official policymakers).  It also appears that neither Pratt, Duke, nor Brach served in such a role to "approve [Barkyoumb's] decision [to harass Plaintiff] and the basis for it."  *City of Saint Louis*, 485 U.S. at 127.

Perhaps more to the point, Plaintiff, to survive summary judgment on her claim, would have to put forth evidence that the City knew that Barkyoumb had violated her

constitutional rights and then, through the individual defendants, made a "conscious, affirmative choice" to ratify his conduct. *Gillete*, 979 F.2d at 1347. *See also Xian Ming Wu v. City of New Bedford*, 2013 WL 4858437, at *4 (Sept. 11, 2013 D. Mass). Plaintiff has failed in this endeavor. Even considering all the known facts - - that each of the individual Defendants testified at the September restraining order hearing on Barkyoumb's behalf, that Pratt spoke with Barkyoumb about his conduct towards Plaintiff but did little else, and that Brach saw a bag containing multiple cell phones on Barkyoumb's desk - - Plaintiff has not shown even for summary judgment purposes that any of these defendants "*chose* to affirmatively ratify [Barkyoumb's] misconduct." *Xian Ming Wu,* 2013 WL 4858437, at *4 (emphasis added) (allegations that city failed to adequately investigate officer's unlawful misconduct, failed to discipline the officer, allowed criminal charges to be filed against the plaintiff, and defended the officer's actions when the plaintiff filed a discrimination complaint "were not enough to plausibly show that the city knew [the officer] had violated plaintiff's rights and chose to affirmatively ratify his misconduct"). Further, any lack of discipline by the City is not sufficient to support a ratification claim. *See Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989) ("[W]e cannot hold that the failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under [section 1983]."). Accordingly, the court will grant summary judgment in favor of Pratt, Duke and Brach on Count IV.

<u>Count V: Section 1983 claim of supervisory liability</u>

Plaintiff claims that Pratt, as Barkyoumb's supervisor, violated her constitutional rights in failing to intervene and discipline him, invoking, in part, the 2009 Guidelines

"which require[] a thorough investigation of claims of domestic violence."  Pratt contends that he is entitled to summary judgment because, among other assertions, he had no duty to intervene and protect Plaintiff.

As a preliminary matter, the court notes that a defendant supervisor must be sued in his individual capacity "for his own acts or omissions."  *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996).  Moreover, "[s]upervisory liability may not be predicated upon a theory of respondeat superior."  *Id.*  As such, the court treats Count V as asserting a claim against Pratt in his individual capacity only.

Under 42 U.S.C. § 1983, a supervisory official may be held liable for the behavior of his subordinates only if (1) the behavior of his subordinate, here Barkyoumb, resulted in a constitutional violation, and (2) the supervisor's action or inaction was affirmatively linked to that behavior "in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference."  *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 902 (1st Cir.1988) (internal citations and quotation marks omitted).

Again, for present purposes, the court will assume that Barkyoumb's conduct, in some measure, resulted in a constitutional violation.  The issue raised by the motion for summary judgment therefore turns on whether Pratt's conduct was affirmatively linked to Barkyoumb's.  Unlike the conscious, affirmative decision discussed above with respect to Plaintiff's ratification claim, however, the requirement of an "affirmative link" between the behavior of a subordinate and the action or inaction of his supervisor "contemplates proof that the supervisor's conduct led inexorably to the constitutional violation."  *Hegarty v. Somerset County,* 53 F.3d 1367, 1380 (1st Cir.1995).

While it is true Pratt made some effort to address Barkyoumb's conduct towards Plaintiff, the court is not convinced on the facts before it that there is no genuine issue of fact as to whether Pratt's response allowed for Barkyoumb to continue his harassment of her  As discussed, Pratt was aware of Plaintiff's complaints about Barkyoumb before she contacted him directly and then learned that she filed for a restraining order against Barkyoumb.  Regardless of whether Plaintiff's complaints amounted to domestic abuse under the Massachusetts statute, a reasonable jury could find that Plaintiff sought help from those who she believed could best assist her but received negligible, if any, assistance.  Despite Pratt's awareness of the issues between Barkyoumb and Plaintiff and, in particular, the intimidating nature of Barkyoumb's behavior, there is no evidence that Pratt either formally or informally warned Barkyoumb of any consequences if he continued such conduct.  As such, a reasonable jury could also infer "acquiescence" on Pratt's part.  *Lipsett,* 864 F.2d at 902.  To be sure, an affirmative link can only be found "if it would be manifest to any reasonable official [here, Pratt] that [Barkyoumb's] conduct was very likely to violate an individual's constitutional rights."  *Hegarty,* 53 F.3d at 1380 (internal citation and quotation marks omitted).  Nevertheless, at this time, the court is not prepared to grant Pratt summary judgment on this count.

B.     State Claims

       Count VI: Negligence claim against the City[4]

       In Count VI of her complaint, Plaintiff alleges, pursuant to section 2 of the Massachusetts Tort Claims Act, M.G.L. c. 258 ("MTCA"), that the City owed her a duty

_____

[4] Given Plaintiff's concession that her claims of negligent hiring, training, and supervision cannot be sustained by the record, summary judgment will enter in favor of the City on Count VII, which asserts a common law claim of negligent hiring, training, and supervision.

of care which it breached. The court understands this claim to be grounded on her allegation that Pratt, in the course of his employment as a Holyoke police officer, breached his duty to protect her, by failing to investigate her complaints about Barkyoumb. Plaintiff does not point to any such conduct by Duke or Brach. The City maintains that it is immune from such liability pursuant to two exceptions of the MTCA set forth in sections 10(b) and 10(h).

Pursuant to M.G.L. c. 258, § 2, "[p]ublic employers shall be liable for injury or . . . personal injury . . . caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment." Certain sections of the MTCA, however, provide immunity from liability for public employers. Pursuant to section 10(h) of the MTCA, a public employer cannot be held liable with respect to "any claim based upon the . . . failure to provide adequate police protection, prevent the commission of crimes, investigate, detect or solve crimes . . . , arrest or detain suspects, or enforce any law." M.G.L. c. 258, § 10(h). It is well established that this section provides immunity for the failure to provide police protection where the criminal acts of a third person are the cause of a plaintiff's harm. *See, e.g.*, *Carleton v. Town of Framingham*, 640 N.E. 2d 452, 455-456 (Mass. 1994) (town not liable where police officers failed to arrest drunk driver who later injured a third party); *Ariel v. Town of Kingston*, 867 N.E. 2d 367, 370 (Mass. App. Ct. 2007) (town not liable where police directing traffic failed to prevent motor vehicle accident); *Ford v. Town of Grafton*, 693 N.E. 2d 1047 (Mass. App. Ct. 1998) (town not liable where domestic violence victim

severely injured after police failed to arrest victim's former husband for violation of a protective order).[5]

The *Ford* decision is particularly instructive here, especially against the background of M.G.L. c. 209A, § 6, which, among other mandates, requires police to arrest "any person whom the officer has probable cause to believe has committed a misdemeanor involving abuse or violation of [an existing] restraining order." The evidence before the court there established that police officers of the town of Grafton failed repeatedly to arrest plaintiff's ex-husband for violations of a protective order issued against him. Indeed, after many incidents involving the ex-husband and many complaints made to the police without any response, the ex-husband broke into her apartment, chased her down, and shot her three times, rendering her quadriplegic. Nonetheless, citing M.G.L. c. 258, § 10(h), the court concluded that, even though "the town's negligence reasonably could be inferred from the evidence, we are bound by the Legislature's explicit choice to immunize the town in the circumstances of this case." *Ford*, 693 N.E. 2d at 1053. As the Supreme Judicial Court itself previously explained, section 10(h) "seeks to immunize a municipality when the criminal acts of a third person are a cause of a plaintiff's harm, and the police were negligent in not preventing that criminal conduct." *Carleton*, 640 N.E. 2d at 456.

With that in mind, Pratt's alleged negligence here, *i.e.,* his failure to prevent the harassment of Plaintiff, falls below that which the *Ford* court deemed negligent but nonetheless immune under section 10(h). Indeed, unlike the situation in *Ford*, there

---

[5] There are some exceptions to this immunity not applicable here, including claims based upon the negligent operation of motor vehicles and the negligent protection, supervision or care of persons in custody. *See* M.G.L. c. 258, § 10(h).

31

was no restraining order in place during the time Pratt was aware of Barkyoumb's repeated communications with Plaintiff. Thus, even viewing the facts in a light most favorable to Plaintiff, the court is not convinced that a jury could find that Pratt acted negligently. More to the point, it is clear by the express terms of section 10(h) that Pratt's conduct, negligent or not, is immune. M.G.L. c. 258, § 10(h).

Plaintiff, it is true, attempts to circumvent section 10(h) immunity by asserting that Barkyoumb did not act as a third party but, instead, as a police officer in the course of his employment. That argument is unconvincing. Based on the record before the court, it appears Barkyoumb acted in his own capacity as a third person when repeatedly contacting Plaintiff; he did not contact her in his role as a Holyoke police offer. Accordingly, summary judgment will enter in favor of the City on Count VI.[6]

Count VIII: Intentional Infliction of Emotional Distress

In Count VIII, Plaintiff alleges that the individual defendants, as well as Barkyoumb, are liable for the intentional infliction of emotion distress on her. In pursuing that claim, Plaintiff is aware that the City, as a public employer, cannot be held liable for the intentional torts of its employees. *See* M.G.L. c. 258, § 10(c); *Mellinger* v. *Town of West Springfield*, 515 N.E. 2d 584, 589 (Mass. 1987). The individual

---

[6] Given that analysis, the court need not address the application of immunity pursuant to section 10(b). Nevertheless, the court notes that the City would likely be immune under that exception as well. Section 10(b) immunizes claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused." M.G.L. c. 258, § 10(b). *See Harry Stoller & Co. v. City of Lowell*, 587 N.E. 2d 780, 783 (Mass. 1992). The "conduct of law enforcement officials in investigating potentially criminal conduct . . . are discretionary functions, and therefore fall within the exception in § 10(b)." *Sena v. Commonwealth of Massachusetts*, 629 N.E. 2d 986, 990 n.5 (Mass. 1994) (internal quotation marks omitted).

defendants, therefore, "are amenable to this intentional tort claim in their individual capacities." *Mellinger*, 515 N.E. 2d at 589.

In order to establish that claim, Plaintiff must demonstrate "(1) that the defendant[s] intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of [their] conduct, but also (2) that the defendant[s'] conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant[s] were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it." *Tetrault v. Mahoney, Hawkes & Goldings*, 681 N.E. 2d 1189, 1197 (Mass. 1997). *Accord Gouin* v. *Gouin*, 249 F. Supp 2d 62, 73 (1st Cir. 2001). In the court's view, however, the record, as a whole, fails to show that the actions of Pratt, Duke, and Brach rose to the level of "extreme and outrageous" conduct necessary to succeed on this claim. *Cf. Boyle v. Wenk*, 392 N.E. 2d 1053, 1054-56 (Mass. 1979).

Even assuming Pratt should have done more to prevent Barkyoumb's harassment of Plaintiff, the record reveals that Pratt made an effort to address Plaintiff's concerns when he spoke to Barkyoumb and advised him to stop contacting her. These facts, in the court's view, are not "beyond all bounds of decency, and utterly intolerable in a civilized community." *Mitchell v. City of Boston*, 130 F. Supp. 2d 201, 216 (D. Mass. 2001). And, as previously discussed, there are few other allegations, if any, pertaining to Brach and Duke's conduct, none of which can be deemed "extreme and outrageous." The same is true with regard to these individual defendants having

testified at either or both of the restraining order hearings, as well as any suggestion that they instigated the alleged rumor that Plaintiff was dating another police officer. Consequently, Defendants Pratt, Duke and Brach are entitled to summary judgment on Count VIII. The claim, however, shall remain alive against Barkyoumb.

Count IX: Negligent Infliction of Emotional Distress

Plaintiff's final count alleges that Pratt, Duke and Brach, as well as Barkyoumb, "were negligent in engaging in the above-mentioned conduct, from which it was reasonably foreseeable that the Plaintiff would likely suffer from emotional distress." To succeed on a claim of negligent infliction of emotional distress, a plaintiff must prove: "(1) negligence; (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case." *Conley* v. *Romeri*, 806 N.E. 2d 933, 936 (Mass. App. Ct. 2004).

Significantly, in response to the individual defendants' argument on this claim, Plaintiff states that "it is clear that Lieutenant Pratt, Detective Duke, and Detective Brach were at all times acting within the scope of their employment as police officers of the Holyoke Police Department." When sued in the capacity Plaintiff describes, a public employee cannot be held individually liable for negligent conduct. The MTCA, relying upon the theory of respondeat superior, charges liability to the public employer for the *negligent* acts of its employees while acting within the scope of his or her employment. *See* M.G.L. c. 258, § 2 ("Public employers shall be liable for injury . . . or personal injury . . . caused by the negligent or wrongful act or omission of any pubic employee while acting within the scope of his office or employment . . . ."). In so doing, the MTCA

34

makes relief against the employer, here, the City, the exclusive remedy for the negligence of its employee. Because the City is not a named defendant on this Count and because Plaintiff asserts that Pratt, Duke, and Brach all acted within the scope of their employment, her negligent infliction of emotional distress claim cannot proceed against them as alleged.

Even if it were properly pled, the claim is still governed by the MTCA and any immunity provisions under the Act would be available to the City. Given that this claim is premised on the same conduct underlying Plaintiff's general negligence claim discussed above, immunity under section 10(h) of the MTCA would also apply. Accordingly, the City would also be entitled to immunity on the instant claim. That said, the court will enter summary judgment in favor of Pratt, Duke and Brach only on Count IX. Again, the claim will survive against Barkyoumb, who is in a significantly different position and who has not sought summary judgment.

IV. CONCLUSION

For the foregoing reasons, Defendants City of Holyoke, Lieutenant David Pratt, Detective Brian Duke and Detective Anthony Brach's Motion for Summary Judgment is GRANTED with respect to Counts I, II (as to Duke and Brach only), III, IV, and VI through IX but DENIED as to Counts II and V, both in regard to Pratt only. With respect to Count III, the court *sua sponte* orders summary judgment in favor of Defendant Barkyoumb. The court further orders that the Holyoke Police Department be dismissed as a party to this case.

IT IS SO ORDERED.

DATED: November 21, 2014                    /s/ Kenneth P. Neiman

KENNETH P. NEIMAN
U.S. Magistrate Judge